**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NICODEMO S. SCARFO,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Civil Action No. 23-22432 (MAS)<br><br>**OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Petitioner Nicodemo Scarfo's ("Petitioner" or "Scarfo") motion to vacate sentence brought pursuant to 28 U.S.C. § 2255 (ECF No. 1), and Petitioner's supplemental motion to vacate sentence (ECF No. 15). Following an order to answer, the Government filed a response to the motion (ECF No. 7), to which Petitioner replied (ECF No. 11). Also before the Court is Petitioner's motion seeking appointed counsel. (ECF No. 9.) For the following reasons, the Court will deny Petitioner's motions and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction, the Third Circuit described the facts underlying this matter as follows:

> This case has its roots in organized crime, and, like other mob cases, it gets its start with family – both biological and made. Nicodemo Domenico "Little Nicky" Scarfo Sr. was the "boss" of the Philadelphia branch, or "family," of La Cosa Nostra ("LCN") for most of the 1980s. He oversaw nearly a decade of murders, gambling, and extortion for the benefit of LCN.

By the time [Petitioner and his codefendants] here began their FirstPlus scheme, however, he was out of the game, serving a lengthy prison sentence[.] His son, [Petitioner] Nicodemo Salvatore "Nicky" Scarfo[,] wanted to fill the power vacuum, but his attempted takeover of the Philadelphia LCN family did not go according to plan. On Halloween 1989, as he was having dinner at a restaurant, masked assailants ambushed him, shooting him several times but, no doubt to their chagrin, not killing him.

When he recovered, Scarfo sought the help of the Lucchese LCN family, which operated in northern New Jersey. He had an "in" with the Luccheses: their boss was incarcerated in the same prison as his father. According to the government's expert on the structure and operations of LCN, eventually the Lucchese family integrated Scarfo into their organizations as a "made member" – someone who has been "fully inducted" and has "taken an oath of loyalty to the family." Being a made member meant that he had to generate money for the Lucchese family and share with it the profits of any criminal activities he pursued.

Scarfo's longtime friend Salvatore Pelullo, although not a blood relative, had a close relationship not only with Scarfo but with Scarfo's father[,] too. The older Scarfo treated Pelullo as his nephew. Pelullo became an "associate" of the Luccheses – a criminal colleague who "hadn't been formally initiated into [the family's] ranks." The government's expert testified that an associate like Pelullo had to "share . . . the profits of any of [his] criminal activity" with the family, and he had to answer to a made member, such as Scarfo, who would "supervis[e] and direct[]" any of his actions.

Before the events at issue in this case, Scarfo and Pelullo had each earned criminal convictions. Scarfo was convicted in 1990 of assaulting a woman in a hospital elevator, and then in 1993 for racketeering conduct. In 2002, he was convicted of running an illegal gambling business. Pelullo, meanwhile, was convicted of bank fraud and making false statements to the SEC in 1999. Three years later, he pled guilty to wire fraud.

. . . .

In 2007, Scarfo and Pelullo stumbled on "the golden vein of delas" – an opportunity that seemed so lucrative, they thought they could ride it into retirement. That opportunity was FirstPlus, a Texas-based mortgage company whose main operating subsidiary had recently exited bankruptcy after falling on hard times.

Following that restructuring, FirstPlus began receiving periodic, multi-million-dollar "waterfall" payments from its bankruptcy trust.[] At that point, it was essentially a dormant parent company receiving the waterfall payments but doing no business.

After the payments started coming in, a former FirstPlus employee, Jack Roubinek, had the idea to locate investors and gain control of FirstPlus. In early 2007, he contacted his attorney, William Maxwell, and asked him to research the possibility of investing in FirstPlus. At around the same time, Pelullo learned about FirstPlus from his business acquaintance David Roberts, a mortgage broker from Staten Island. A group including Pelullo, Roberts, Scarfo, Roubinek, and Gary McCarthy (Pelullo's attorney and eventual codefendant) gathered in Philadelphia to discuss a potential takeover of FirstPlus.

At first, according to Roberts, their thinking was "to try to raise money to buy [FirstPlus's] stock[.]" That plan, however, fell through: the group realized that none of them had the money needed to buy the stock. Luckily for them, however, FirstPlus had recently fired Jack Draper, a high-ranking employee. Draper had griped about his firing to Roubinek – the two having become acquainted while employed at FirstPlus – and to William Maxwell.[] Those three were joined by Roberts and Pelullo for a meeting in Dallas, where Draper, bearing a grudge, told the group he was willing to "divulge all" and accuse the FirstPlus board and CEO Daniel Phillips of financial improprieties.

That "completely changed the direction of the plan." Seeing an opportunity, Pelullo, who was emerging as the leader of the takeover group, worked with William Maxwell to send letters to Phillips and other board members. The letters were purportedly written by Draper and threatened that he would go to "the FBI, the IRS[,] the U.S. Attorney's [O]ffice[,] [FirstPlus's] Bankruptcy's attorney and the SEC" with claims of financial misconduct including bribery, money laundering, and Sarbanes-Oxley violations.[] They also threatened to tell Phillips's wife – who was then divorcing him – that Phillips had raped an assistant and used the company's moneys to pay off the victim when she got pregnant. According to Phillips, all those claims were false, but he was nonetheless concerned that their dissemination would cause grave damage to his and the company's reputations.

The letters had their intended effect. Phillips met with William Maxwell and Pelullo, who indicated the allegations would be dropped if Phillips and the FirstPlus board handed the business over to them. Evidently, it was an offer he couldn't refuse.

Phillips swiftly persuaded the entire board to give up their positions rather than try to engage in what would be a messy and expensive fight with Pelullo's group. Pelullo then selected a new board of directors for FirstPlus: William Handley (a friend of Pelullo's who took over as Chief Financial Officer), John Maxwell (William Maxwell's brother and the titular Chief Executive Officer), Roberts (who became secretary of the company), Harold Garber (Scarfo's father's attorney, who became the new board chairman), and Robert O'Neal (one of William's clients, who later succeeded Garber as chairman).[] The necessary corporate formalities were followed and, on June 7, just four days after sending the threatening letters, Pelullo and his cronies had total control of the company.

. . . .

With FirstPlus in their power, the new officers and directors went to work – making the company work for them. Pelullo, along with William Maxwell, controlled the show. They even obtained stamps of the directors' signatures so they could run the looting scheme without interference.

The board entered into a "legal services agreement" with William, who became FirstPlus's "special counsel." The contract formally granted him significant power within the organization. It purportedly gave him "[a]ll legal authority for any matter involving" FirstPlus; the power to select and retain legal counsel, accountants, and, "in [his] sole discretion," "any and all consulting firms"; and the right to "spend funds, incur legal expenses, and to expend fees in excess of [his] retainer and to seek reimbursement[.]" He could also "restrict disclosure of the information . . . to any person[,]" including the members of the board. For his supposed labors, William made $100,000 a month, plus expenses of up to $30,000.

With that authority, William hired Pelullo as a consultant to FirstPlus, a role that shielded him from public scrutiny. In practice, though, Pelullo was the "de facto president" of the company, according to FirstPlus's public auditor, Anthony Buczek. John Maxwell was named as CEO, but he largely functioned under Pelullo's control.

Using his controlling position at FirstPlus, and with William's help, Pelullo set up several channels through which money flowed out of FirstPlus's accounts and into his and Scarfo's coffers. For one, Pelullo set up a bogus trust that ostensibly had his children as its beneficiaries. In practice, however, according to

codefendant Cory Leshner [("Leshner")], the trust was "created for the purposes of owning" Seven Hills Management, LLC, a company with Pelullo's brother-in-law, Alexander Lyubarskiy, listed as its head.[] Lyubarskiy's supposed management of Seven Hills was strictly for show; "[e]verything he did was at the direction of Mr. Pelullo."

William Maxwell, on FirstPlus's behalf, retained Seven Hills to provide FirstPlus with "consulting services." The agreement entrusted Seven Hills (and, through it, Pelullo) with a "litany of duties" that Leshner summarized as "helping run the entire operation" of FirstPlus. Seven Hills was compensated $100,000 each month plus $15,000 in expenses.

Scarfo, meanwhile, profited from FirstPlus as well. Like Pelullo, he set up a trust that was nominally intended to "benefit[] [his] daughter" but in actuality served as a vehicle for his own gain. That trust, in turn, owned Learned Associates of North America, LLC ("LANA"); both entities were run "[o]n paper" by Scarfo's cousin and codefendant John Parisi. That was a ruse to keep Scarfo's name off the books; "[i]n reality," it was Scarfo, not Parisi, who controlled the trust and LANA. LANA enabled Scarfo to get in on the take through a secondary consulting agreement between LANA and Seven Hills. The agreement obliged LANA to perform for FirstPlus "exactly the same" tasks that Seven Hills was already being paid to do, according to an FBI investigator. In practice, LANA performed no work, but the deal entitled LANA (and, through it, Scarfo) to a roughly one-third cut of what Seven Hills was getting from FirstPlus. As the government puts it, those payments were "effectively 'tribute'" to Scarfo.

Those arrangements were all facilitated by William Maxwell, to whose attorney trust account the consulting fees and expenses were wired. William generally passed those on to Seven Hills, which in turn sent $33,000 a month, plus so called expenses, to LANA. Pelullo was "completely involved with" and oversaw the flow of money from FirstPlus to Maxwell and on to the consulting firms.

Pelullo and Scarfo also profited from FirstPlus by having it acquire three shell companies they owned. First up was Rutgers Investment Group, LLC, an unsuccessful mortgage loan provider majority owned by LANA and Seven Hills. Rutgers's single source of revenue was receivables it supposedly got from Shore Escapes, a defunct vacation sales company also owned by Seven Hills and LANA. It was make-believe money, but on June 7, the new team's first day in office, Pelullo got approval for the acquisition from the

FirstPlus board, and the following month FirstPlus bought Rutgers for approximately $1.8 million and 500,000 FirstPlus shares.

Two more acquisitions of companies owned by Seven Hills and LANA followed soon after. FirstPlus bought Globalnet Enterprises, LLC, a financially struggling cleaning company, for around $4.5 million and more than one million shares of FirstPlus stock. It then paid $725,000 – including $100,000 directly to each of Seven Hills and LANA – to buy The Premier Group, LLC, a company Pelullo set up in May 2007 to hold the assets of a company at least nominally in the business of representing the interests of insurance policyholders.

Pelullo made sure that FirstPlus bought his and Scarfo's companies on preposterously favorable terms. To conduct valuations of the target business, he brought in Kenneth Stein, the head of a business brokerage firm. Stein told Pelullo that [Stein] was unqualified to perform the valuations, but Pelullo said to "[j]ust get it done[.]" Though Stein believed the companies' financials were "horrific" and "atrocious," Pelullo pressured him into preparing nominally "independent" valuation reports that overvalued the businesses. William Maxwell covered up Pelullo's involvement by listing his own name on the engagement letters and handling Stein's payments.

Also helping grease the skids were two of Pelullo's attorneys – David Adler and Gary McCarthy. Although FirstPlus's public filings said that the acquisitions were "completed on an arms-length basis" that was not even remotely true. Pelullo had his lawyers on both sides of the negotiating table, with Adler representing FirstPlus and McCarthy representing the shell companies.

In the meantime, Scarfo, Pelullo, and William Maxwell began to take advantage of their ill-gotten gains. Scarfo bought a house and expensive jewelry for his wife; Pelullo purchased a Bentley automobile; Scarfo and Pelullo together bought a yacht; and William and Pelullo had FirstPlus acquire a plane for their personal use. The scheme was working as planned.

Still, the fact that FirstPlus was a public company, with disclosure requirements under federal securities laws, added complications to the looting. To get around those requirements, Pelullo hired Anthony Buczek as FirstPlus's auditor, based on a referral by Howard Drossner, who later became a codefendant. Pelullo pressured Buczek into hiding or obscuring material information about the company – such as the Rutgers and Globalnet acquisitions, the consulting agreements, and Pelullo's prior federal

fraud convictions[] – even though FirstPlus was required to disclose that information in it SEC filings.

. . . .

The party had to come to an end, and eventually the actions of the FirstPlus thieves caught up with them. While investigating a tip that Scarfo was again trying to gain control of the Philadelphia LCN, the Federal Bureau of Investigation became aware of the mob ties and suspicious circumstances surrounding the resignation and replacement of FirstPlus's former board. As FBI agents dug deeper, they came to believe – rightly – that Pelullo and Scarfo were behind the FirstPlus takeover and would systematically steal from it. They obtained court permission to track the defendants' locations through their cellphones and wiretap their calls over the course of several months. Among the calls the agents picked up were communications between Pelullo and his lawyers (Maxwell, McCarthy, and Donald Manno). To weed out any discussions protected by Pelullo's attorney-client privilege, the government asked the District Court to review in camera the records of wiretaps assembled by a special "filter team" before they were transmitted to prosecutors[] – all, of course, unbeknownst to Pelullo.

The conspirators eventually came to suspect that they were under investigation. For example, while on a long drive from Dallas to deliver a gun to Scarfo's house in New Jersey, John Maxwell suspected that the government had agents following him in a car and in a helicopter.

The government's investigations escalated on May 8, 2008. That day, the FBI executed search warrants at thirteen locations across the country, including FirstPlus's offices in Texas and the defendants' homes, offices, and law firms in Pennsylvania and New Jersey. They also seized the plane, the Bentley, and the yacht, along with guns they found on board the yacht and more guns and ammunition found at Scarfo's and Pelullo's homes and Pelullo's office. It took another three years for the government to obtain an indictment from a grand jury, but that day did arrive. In unpacking the evidence and building their cases, prosecutors set up additional filter teams to review the evidence recovered from McCarthy's and Manno's law offices and to set aside anything that was privileged before turning the rest over to the team handling the prosecution of the defendants.

. . .

When Scarfo, Pelullo, and their co-conspirators took over the company in early June 2007, FirstPlus had almost $10 million in

> its accounts, and it received a $4.4 million waterfall payment later that year. By the following May, when the FBI seized the accounts, there was less than $2,000 left. Between the fraudulent consulting and legal-services agreements channeled through bogus trusts and the acquisitions of virtually worthless companies, the conspirators had bled FirstPlus dry. It soon fell into bankruptcy, leaving its more than 1,200 public stockholders with the company's husk.

*United States v. Scarfo*, 41 F.4th 136, 157-62 (3d Cir. 2022) (internal citations and record citations omitted).

## II. LEGAL STANDARD

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied*, 444 U.S. 865 (1979); *Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

## III. DISCUSSION

### A. No evidentiary hearing is necessary in this matter

A district court need not hold an evidentiary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."

28 U.S.C. § 2255(b); *United States v. Booth*, 432 F.3d 542, 545-56 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992). "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." *Judge v. United States*, 119 F. Supp. 3d 270, 280 (D.N.J. 2015); *Gov't of V.I. v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546. Because Petitioner's claims are all either barred or clearly without merit for the reasons expressed below, no evidentiary hearing is necessary in this matter.

**B. Petitioner's claims related to the timing of his investigation and indictment**

In his first pair of claims, Petitioner contends that a state witness, Case Agent Gilson, lied in testifying that the investigation into the FirstPlus scheme did not begin until 2007. Based on the final page of the sealed indictment in his criminal matter, which contains a file number, 2005R01468, Petitioner believes that the investigation into his criminal conduct began in 2005, as soon as he left prison to begin his term of supervised release, rather than in 2007. (*See* Docket No. 11-740 at ECF No. 1 at 108.) Plaintiff further speculates that this tracking number *must* mean that there is favorable information that was not disclosed to him by the Government regarding a pre-2007 investigation which he further speculates would have been both material and beneficial to his case. Plaintiff's claim, which appears to be based upon a U.S. Attorney's Office internal tracking number as it does not relate to any court docket number (*see* ECF No. 7 at 33), both overstates any significance this reference on the indictment may have and its relevance to Petitioner's conviction in this matter. Even assuming, *arguendo*, that this tracking number relates to surveillance or oversight of Petitioner prior to the onset of the FirstPlus scheme, it does not actually undermine or prove false any testimony by Agent Gilson. Gilson testified that the investigation into the FirstPlus scheme did not begin until 2007. He also testified that law

enforcement had remained aware of Petitioner prior to the investigation following his supervised release from federal prison.[1] As a factual matter, then, Petitioner has not shown perjury or the suborning of such. That the Government kept tabs on Petitioner prior to the onset of the investigation about which Agent Gilson was speaking is not in and of itself any violation of Petitioner's rights.

Petitioner's chief contention in his first ground is less concerned with perjury. Instead, Petitioner contends that this internal tracking number indicates a *Brady* violation – i.e., that the Government suppressed material favorable evidence which would have benefitted Petitioner at trial. *See Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner, however, first received a copy of the true bill, which contained the tracking number, at his indictment in 2011. He thus had the means and ability to present his claim that the Government may be suppressing unknown evidence based on the tracking number both before the trial court and on direct appeal. Because Petitioner could have presented this claim long before his conviction or on direct review, the claim is procedurally defaulted.

---

[1] Petitioner argues in his reply that any investigation or surveillance of him prior to 2007 would render this testimony suborned perjury, rather than a misunderstanding or Agent Gilson and defense counsel talking past one another. Petitioner has provided no evidence to support his contention that Gilson's testimony was perjury. Petitioner likely could not support his contention in light of the fact that Gilson did testify that Petitioner was on the radar of law enforcement prior to the FirstPlus investigation, and that some limited surveillance of Petitioner had been conducted in 2006. Petitioner's perjury-related arguments are thus based on a skewed reading of Gilson's testimony and are based entirely on speculation that some untoward activity not in the record occurred prior to the FirstPlus investigation. Further, Petitioner attempts to strengthen his claim by asserting that this portion of Gilson's cross examination was the central point of his defense strategy. However, it is doubtful that Gilson's testimony on this point—the date upon which the investigation started in earnest—had any great effect upon the outcome of his case. In light of the overwhelming evidence of Petitioner's guilt, it is clear that any misunderstanding between Gilson and defense counsel as to what Gilson meant about the onset of the investigation was entirely harmless. *See Fry v. Pliler*, 551 U.S. 112, 115-16 (2007) (stating that trial error is generally harmless and there is no basis for collateral relief in a habeas proceeding unless it had a "substantial and injurious effect or influence in determining the jury's verdict").

Because "[h]abeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal,'" *Bousley v. United States*, 523 U.S. 614, 621 (1998) (first quoting *Reed v. Farley*, 512 U.S. 339, 354 (1994); and then quoting *Sunal v. Large*, 332 U.S. 174, 178 (1947)), any claim that could have been, but was not, raised before the trial court or on direct appeal is considered procedurally defaulted for the purposes of a § 2255 motion. *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *United States v. Frady*, 456 U.S. 152, 167-68 (1982); *Parkin v. United States*, 565 F. App'x 149, 151-52 (3d Cir. 2014). A petitioner may not receive relief on a defaulted claim unless he either shows that he is factually innocent of the charged offenses, or shows cause and actual prejudice sufficient to overcome his default. *Parkin*, 565 F. App'x at 151-52; *see also Lawrence v. United States*, No. 18-16006, 2023 WL 6392918, at *1 (D.N.J. Oct. 2, 2023). Cause in this context requires that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim." *Id.* at 151 (quoting *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005)). Even where he shows cause, a petitioner will still not be entitled to relief unless he shows actual prejudice, *i.e.*, that the alleged errors "worked to his actual and substantial disadvantage infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Establishing actual innocence sufficient to overcome the default bar instead requires a petitioner to show that "in light of all the evidence it is more likely than not that no reasonable juror would have convicted him," *i.e.*, that he is factually innocent. *Bousley v. United States*, 523 U.S. 614, 623-24 (1998).

Given the overwhelming evidence of Petitioner's guilt, *see Scarfo*, 41 F.4th at 191, 195, 228 (noting, repeatedly, the overwhelming evidence of guilt provided at trial), and the fact that Petitioner provides no more than mere speculation that this tracking number indicates undisclosed evidence or perjury on the part of the testifying agent, Petitioner has failed to show that he is actually innocent or that he was prejudiced by the agent's testimony that the investigation began

in 2007, which appears to be essentially accurate. Petitioner, consequently, has failed to show any basis upon which to evade the procedural default bar as to these claims. The evidence presented at trial clearly established Petitioner's guilt, the testimony in question was at best of very limited value to Petitioner at trial, and Petitioner has not alleged any specific information to support his assertion that he was denied or the Government suppressed evidence. Petitioner, thus, cannot show that he was prejudiced. Petitioner's base speculation provides no basis for habeas relief.

Petitioner next claims, again basing his belief solely on the tracking number issue, that he was not ever properly indicted by a federal grand jury. This claim is belied by the record, which shows that a federal grand jury returned a bill of indictment as to Petitioner and his co-conspirators. (*See* Docket No. 11-740 at ECF No. 1 at 1-108.) Petitioner's claim is clearly false, and provides no basis for habeas relief.

### C. Petitioner's claims related to the *Botsvynyuk* human trafficking case

In his next series of claims, Petitioner contends that the Government suppressed material related to a human trafficking case in the Eastern District of Pennsylvania in which Petitioner believes both Leshner and Pelullo were involved. Petitioner contends that had he possessed this information, he could have used it to impeach Leshner and to seek a severance of his trial from Pelullo. The Third Circuit summarized the background of this claim as follows:

> [After trial, Petitioner sought to subpoena new evidence which would have purportedly shown a *Brady* issue.] The new information consisted of certain witness statements taken prior to the trial and pursuant to an unrelated investigation of human-trafficking activity, an investigation that was ultimately prosecuted in the United States District Court for the Eastern District of Pennsylvania ("the *Botsvynyuk* case"). [The government, for its part, first learned about the witness statements when Pelullo's attorney notified the government that he had received documents from a defense attorney in the *Botsvynyuk* case. Prosecutors then obtained copies of the statements from their counterparts in the Eastern District of Pennsylvania before furnishing them to the District Court here for in camera review.] [Petitioner] and his codefendants wanted access

> to those witness statements, memorialized on FBI forms known as 302s, because they might mention Pelullo. [These documents apparently indicated that Pelullo was involved with a company that had hired some of the human-trafficking victims from the *Botsvynyuk* case, but the government had not uncovered any evidence to suggest Pelullo or Leshner had been complicit in any of the criminal conduct in that matter. The Government provided Pelullo's attorney the opportunity to review all documents mentioning him in that case, but Petitioner sought an entire copy of the file of the E.D. Pa. case.] And, because of Pelullo's involvement in the human trafficking, the Defendants thought the documents might in turn show criminal conduct by Cory Leshner – Pelullo's "right hand man" and later a key government witness – and therefore provide helpful impeachment evidence.
>
> Pelullo thus filed a sealed motion to compel disclosure of the 302s, and [Petitioner] filed a motion to subpoena the documents pursuant to Federal Rule of Civil Procedure 17.[] After reviewing the 302s in camera – and entertaining multiple rounds of briefing plus a hearing – [Judge Kugler] denied the motions as seeking irrelevant and non-exculpatory information and because the 302s never mentioned Leshner. The Court also made clear that it would not entertain any more motions from [Petitioner] before sentencing.
>
> [Petitioner] then requested leave to move for a new trial.[] [Judge Kugler] denied the request as "probably untimely" and because the 302s simply did not contain the information claimed by [Petitioner].

*Scarfo*, 41 F.4th at 224-25, 224 nn.109-19.

Petitioner now seeks to essentially reconstrue and assert these claims as *Brady/Giglio* violations. Petitioner argues that, had he possessed the "superior knowledge" of the *Botsvynyuk* case that the Government allegedly possessed, he could have better challenged the credibility of Leshner and other witnesses, could have better moved for severance of his case, and could have argued for a lower loss amount by suggesting that some of the money was paid as kickbacks by Pelullo to persons involved in the human trafficking scheme.

As Judge Kugler and the Third Circuit previously explained to Petitioner in denying his request for subpoenas and for permission to file a motion seeking a new trial, however, Petitioner's

speculation is entirely misplaced. The uncontradicted certifications submitted by prosecutors and Judge Kugler's in camera review of the relevant 302s indicate that: (1) neither Pelullo nor Leshner were persons of interest involved in the human trafficking case; (2) prosecutors and investigators in that case developed no evidence reflecting Leshner's involvement in that case; and (3) Pelullo's involvement was at best tangential and never rendered him a person of interest or suggested that he had any criminal exposure in relation to the human trafficking scheme. *See Scarfo*, 41 F.4th at 224-26; (*see* Docket No. 11-740 at ECF No. 1252-1; ECF No. 1278.)

Petitioner's claim relies entirely on his own assumptions and speculations rather than any actual information in the record. Petitioner has not shown that there was any suppressed material or impeaching information that would support a proper *Brady* or *Giglio* claim. Likewise, to the extent Petitioner's claims are essentially a reassertion or re-presentation of the claims he presented to Judge Kugler and the Third Circuit in post-trial motions and in his prior appeal, he may not pursue them in this habeas matter. *See United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993) (§ 2255 motion may not "be used to relitigate matters decided adversely" in prior appeal); *see also United States v. Travillion*, 759 F.3d 281, 288 (3d Cir. 2014) (stating that "issues resolved in a prior direct appeal will not be reviewed again by way of § 2255 motion"); *Cvjeticanin v. United States*, No. 19-549, 2022 WL 280185, at *3 (D.N.J. Jan. 21, 2022) (stating that § 2255 motion may not be used to relitigate issues decided adversely on appeal or in post-trial criminal motions).

Petitioner has not shown that the *Botsvynyuk* case or surrounding investigation produced any favorable material or impeaching evidence. In addition, Petitioner provides no more than base speculation that any such suppressed evidence was in the Government's possession. Petitioner's speculation is also contrary to the evidence in the record submitted during post-trial motion practice. Petitioner, consequently, has failed to show that the Government violated his *Giglio* or

*Brady* rights or that Judge Kugler erred in refusing to permit him to pursue post-trial subpoenas or motions for a new trial by denying him further access to the 302s and related documents from the *Botsvynyuk* case. Petitioner has failed to show that there was any valuable information which could have been used to better impeach Leshner or any other witness, or that there was any information contained in that file which would have provided a good basis for severing his case from Pelullo's insomuch as the *Botsvynyuk* case did not reveal any relevant potential criminality by Pelullo. The denial of access to those records did not violate Petitioner's rights, and provides no basis for habeas relief.

Petitioner further argues that he could have used knowledge of the human trafficking issue to try to reduce the loss amount attributable to him by arguing that some of the money was related to Pelullo paying kickbacks or hiring illegal aliens. Putting aside that this argument is based on the same unsupported speculation as his preceding claims related to the human trafficking case, as the Third Circuit explained on direct appeal, the loss amount in this case was determined in a straightforward manner. The loss was determined by calculating the total amount of funds possessed or obtained by FirstPlus when Petitioner and his codefendants gained control over it through their criminal conspiracy and comparing it to the paltry amount left when the scheme came to a close. *See Scarfo*, 41 F.4th at 212-13. That calculation resulted in a "conservative number" of over fourteen million dollars. *Id.* Indeed, for any recalculation to have an effect upon Petitioner's sentencing calculation, the loss amount would have to be reduced by more than five million dollars, a reduction of approximately thirty-five percent. *Id.* at 213. Petitioner's unsupported speculation does not support such a massive reduction in the loss amount. In addition, Petitioner has not provided any valid argument to suggest why the loss amount from the FirstPlus scheme would be reduced merely because Pelullo allegedly used that money in furtherance of his

other schemes. Petitioner, thus, cannot show that he was prejudiced in relation to the loss amount calculation, and that claim is thus no basis for relief in this habeas matter.[2]

**D. Petitioner's unadmitted evidence claims**

In his next series of claims, Petitioner contends that his rights were violated when a significant number of exhibits used at trial were permitted into the jury room in electronic form without being specifically and explicitly moved into evidence. Most of these exhibits were recorded conversations that were played, at least partially, during trial. Petitioner also contends that it was improper for the Government to reference these exhibits in its opening and summation, and for the trial and appellate courts to rely on those exhibits in rendering their decisions throughout the trial and appeal process. Petitioner has not attempted to show that any of these unadmitted exhibits were not admissible at trial. Indeed, many were determined to be admissible by Judge Kugler prior to trial. In addition, Petitioner has not identified a single exhibit that was found to be inadmissible which was provided to the jury on tablets during deliberations. Instead, Petitioner's claims focus on the procedural failure to explicitly move the exhibits into evidence prior to the close of trial.

During an April 23, 2019, conference, Judge Kugler described the way in which exhibit admissions had been handled at trial as follows:

> The court doesn't, never had and probably never will keep an official exhibit list. The official record of the exhibits is that which is found in the transcript. Every transcript has an entry for every exhibit that's been introduced successfully in evidence and there's an index of them. Having said that, in this case, the court also never retains exhibits. In this case the way we handle[d] the exhibits [was] at the end of each week. . . I asked counsel and I appointed Mr. Catanzaro as the defense liaison counsel for exhibits to make sure

[2] Even if Petitioner's argument was of greater merit, the Court further notes that claims of guidelines errors, such as miscalculated loss amounts increasing the recommended guidelines range, are generally not cognizable in a § 2255 proceeding. *See United States v. Folk*, 954 F.3d 597, 604 (3d Cir. 2020).

> that those exhibits that had been introduced were successfully uploaded into our system. And at the end of the trial I made sure all counsel were in accord as to what was uploaded and each and every one of you said that it had been examined and it was, you agreed that the exhibits that we had uploaded into our system [for jurors to view] were those exhibits which had been successfully introduced in evidence and I got that from[] agreement from everybody on the record before the jury sought any exhibit whatsoever.

(Appellate Joint Appendix, Third Circuit Docket No. 15-2811 at ECF No. 174 at E3866.)

When the issue of discrepancies between the exhibit list uploaded by the parties and provided to the jury and the exhibits formally entered into evidence at trial was brought to Judge Kugler's attention, he noted that during the trial parties regularly forgot to enter things into evidence as they were discussed or played at trial only to be entered later in proceedings, and that many exhibits were entered in batches. (*Id.* at E3891.) When defense counsel raised the issue of unadmitted exhibits being placed before the jury, Judge Kugler further noted that counsel themselves had been in charge of making sure only admitted exhibits were uploaded for juror viewing, that defense counsel was supposed to have been checking weekly to make sure there were no missed exhibits, and that exhibits were only permitted to go to the jury after all parties had assured the Court that all the uploaded exhibits were proper. (*Id.* at E3891-92.) Judge Kugler further noted that defense counsel had an opportunity to object to any evidence before it was viewed by the jury during trial, and that he had resolved each objection that had been made. (*Id.* at E3893-94.)

Considered in total, these conversations make it clear that defense counsel was provided opportunities to oppose or object to any of the exhibits used at trial, was given ample opportunity to challenge any exhibit that went to the jury prior to deliberations if there were questions of its provenance, and that counsel did not raise the issue until several years after the trial had been completed and the direct appeal was proceeding at pace. The record also makes it clear that any

failure to formally move exhibits into evidence prior to them being uploaded for juror view on tablets during deliberations was inadvertent, with both defense counsel and the government under the impression that everything had been properly admitted. Given the absence of any argument to suggest that any of the exhibits were inadmissible or would have been excluded had the admission issue been timely raised, it is also clear that the only issue here is that the formal procedural act of admitting the exhibits into evidence was inadvertently not completed prior to the close of trial. To the extent Petitioner contends that the Government's use of the exhibit list before Judge Kugler or on direct appeal amounts to a fraud on the Court, Petitioner has made no such showing, nor has Petitioner made an attempt to show anything approaching fraud rather than mere mistake.

More to the point, it is clear from the record that Petitioner was aware of this issue and could have raised it on direct appeal, and did not. These claims are therefore procedurally defaulted and cannot serve as grounds for relief absent a showing of actual innocence, which Petitioner does not assert, or cause and prejudice. Petitioner's only cause argument is that counsel failed to raise the issue on appeal after it was discovered during appeal preparations. For prejudice, Petitioner turns to the Government's candid admission that had the evidence been excluded from trial *entirely*, the Government's case against him would have been weaker, which, while true, would not have been the case here. Even if these exhibits were not permitted onto the tablets available to jurors during deliberations, the jury had already been exposed to the information in the challenged exhibits. Petitioner's assertion of actual prejudice is thus dubious.

Even if the Court were to excuse Petitioner's default, these claims would still fail to provide a basis for habeas relief. It is "ordinarily the responsibility of counsel to check the exhibits and failure to object in a timely manner can under some circumstances constitute a waiver." The Third Circuit, however, has permitted criminal defendants on direct appeal to challenge the provision of unadmitted documents to the jury where counsel did not object prior to deliberations *provided* the

defendant can show that there was error, it was plain, and the error affected the defendant's substantial rights and was not harmless. *See, e.g.*, *United States v. Streeval*, 70 F. App'x 646, 650 (3d Cir. 2003) (quoting *Gov't of V.I. v. Joseph*, 685 F.2d 857, 864 (3d Cir. 1982)). Under a direct appeal plain error standard, even the inadvertent provision of extraneous overly prejudicial unadmitted documents, annotations, or contraband may support the overturning of a conviction. *See, e.g.*, *United States v. Lee*, 573 F.3d 155, 162 (3d Cir. 2009); *Joseph*, 685 F.2d at 864 (finding that the submission of a letter and signed confession which had not been presented during trial but directly corroborated a contested witness's version of events to the jury during deliberations was plain error warranting reversal). If exhibits are presented to the jury during trial but not formally admitted, and all parties assumed their admission before they were provided to the jury during deliberations, it will not automatically warrant reversal, even on direct appeal. Reversal would only be necessary upon a showing that the jurors' access to the material they had previously seen during trial "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." Thus, the error is often harmless. *See, e.g.*, *Streeval*, 70 F. App'x at 650-51; *see also United States v. Jenkins-Watts*, 574 F.3d 950, 963-64 (8th Cir. 2009) (finding that submission of unadmitted demonstrative exhibit which the jury had previously seen but was not entered into evidence to the jury during deliberations was not plain error warranting reversal); *accord United States v. Samak*, 7 F.3d 1196, 1197 (5th Cir. 1993).

On habeas review, an error will not warrant relief merely for meeting the plain error standard. Instead, an error, even of constitutional dimension, will generally only provide a basis for habeas relief in a collateral attack proceeding where the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry*, 551 U.S. at 115-16. Here, Petitioner's case did not involve an extraneous or outside the record item being secreted or accidentally provided to the jury, but instead involved exhibits, previously used during his trial, being uploaded

for jury access without formally being entered into evidence, without objection and with the parties apparently believing at the time that all items had been properly entered over the course of a lengthy trial that contained innumerable documents, recordings, and exhibits. None of these exhibits was truly new, extraneous, or inadmissible. Petitioner's case is thus far afield from cases finding plain error on direct appeal. *See Joseph*, 685 F.2d at 864. Petitioner's case is far more akin to cases excusing minor procedural errors regarding documents being entered into evidence as failing to affect the fairness or integrity of a petitioner's trial. *Streeval*, 70 F. App'x at 650-51; *see also Jenkins-Watts*, 574 F.3d at 963-64. In light of the overwhelming evidence of Petitioner's guilt at trial, the procedural posture of this claim, and the fact that the jury had already been exposed to the items in question during trial, the Court concludes that any error in failing to formally enter exhibits into evidence was not capable of having a substantial and injurious effect on the jury's verdict, and that any such error was thus harmless and not a basis for habeas relief. *Fry*, 551 U.S. at 115-16. Petitioner's claims asserting that he was denied a fair trial by the submission of various unadmitted exhibits, or that his rights were impugned when those documents

were considered by the trial judge or Third Circuit on direct appeal, or that the Government's inadvertent failure to enter them into evidence amounts to a fraud on the court are thus denied.[3]

### E. Petitioner's intrinsic evidence claim

Petitioner next challenges the admission of testimony at trial regarding his violation of the terms of his supervised release as part of the Government's case in chief with respect to Petitioner's conspiracy to commit obstruction charge. Petitioner contends that this evidence should not have been admitted in light of its prejudicial nature. Petitioner, however, ignores that the evidence in question was intrinsic to the obstruction charge because that charge was based, at least in large part, on the lies told to the officers overseeing Petitioner's supervised release. Evidence of the other bad acts of a criminal defendant will be admissible and not subject to Rule 404(b)'s limits on the introduction of evidence of prior bad acts as intrinsic evidence where it "directly proves" the charged offense or the bad acts in question "facilitate the commission of the charged crime." *United States v. Green*, 617 F.3d 233, 248 (3d Cir. 2010). In seeking to admit intrinsic evidence, the Government need not meet the notice requirements of Rule 404(b), nor must a limiting instruction under that rule necessarily be provided. *Id.* at 247. Such evidence must still be relevant,

[3] In the midst of asserting his unadmitted exhibits claims, Petitioner also briefly asserts that some of the exhibits involving co-conspirators making admissions of guilt violated the Confrontation Clause. Petitioner, however, has not attempted to show that these recordings were testimonial in nature, and thus cannot show a Confrontation Clause violation. *See United States v. Berrios*, 676 F.3d 118, 126 (3d Cir. 2012) (stating that the Confrontation Clause protects against the admission of only testimonial hearsay statements of unavailable declarants, and nontestimonial statements or recordings are governed only by the rules of evidence); *see also United States v. Hendricks*, 395 F.3d 173, 179-80 (3d Cir. 2005) (noting that statements are generally testimonial when they: are actual testimony; its functional equivalent; contained in testimonial documents such as affidavits, depositions, or confessions; or are "made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial"). As Petitioner has not shown that the statements are testimonial in nature, or that they would be otherwise inadmissible, Petitioner has failed to show that the use of these recorded statements of co-conspirators at trial violated his constitutional rights separate and apart from the issue regarding the failure to formally admit exhibits after being played at trial.

must not be admitted solely to show the defendant's propensity for criminal activity, and must not be so unduly prejudicial that its admission runs afoul of Rule 403. *Id.* Even evidence of bad acts, such as violent threats, uncharged murders, or uncharged rapes, can meet these hurdles where relevant and sufficiently probative of the defendant's guilt. *Id.* at 252.

Here, Petitioner challenges the admission of testimony regarding false statements he gave to the officers overseeing his supervised release about his involvement with LANA, his felon co-conspirators, and other aspects of the FirstPlus scheme, which resulted in a violation of the terms of his supervised release. That evidence was highly probative of Petitioner's guilt in regards to the conspiracy to obstruct justice charge and was not so unduly prejudicial in light of the charged crimes and other evidence presented that its suppression would have been warranted or granted had counsel moved to suppress or bar that testimony. Likewise, as the evidence of the false statements to the officers directly proved aspects of the conspiracy, it was intrinsic to the charged offense and therefore was not subject to the strictures of Rule 404(b). As the evidence was clearly admissible, and any attempt to suppress it would have failed, Petitioner's claim related to this evidence provides no basis for habeas relief.[4]

**F. Petitioner's claim regarding the use of the term "Offender"**

Petitioner next contends that his rights were violated when witnesses, the prosecution, and the trial judge referred to him as an "offender" in relation to his having violated the terms of his supervised release as part of the FirstPlus scheme. The term was used by witnesses, the parties, and the trial judge at trial in relation to Petitioner's violation of supervised release by committing further federal crimes. The use of the term, therefore, was not a gloss or insult, but rather a statement of fact regarding Petitioner's status. Petitioner having previously committed a federal

---

[4] The Court further notes that this claim could have been, but was not raised on appeal, and is for that reason also procedurally defaulted.

crime, his supervised release status, and his violation of his supervised release status were all entered into evidence at trial. In light of the factual nature of the statement in that context, Petitioner cannot show that the use of the term offender at trial caused a substantial and injurious effect on the outcome of his trial. The use of the term, to the extent it could be considered erroneous, was therefore harmless and serves as no basis for habeas relief. *See Fry*, 551 U.S. at 115-16.

### G. Petitioner's contention that his rights were violated by the actions of codefendant Manno

Petitioner also argues that his rights, either under the Sixth Amendment or Due Process clause, were violated by actions taken by the Government and codefendant Donald Manno in relation to the prosecution of Manno, Petitioner's former counsel in a number of unrelated criminal matters. Petitioner chiefly contends that his rights were violated when the trial court conducted a conference with Manno and the Government without the presence of Petitioner's counsel after Manno filed a motion seeking severance of his case from Petitioner's. This conference, however, centered on the trial court's suggestion to Manno that he acquire counsel rather than represent himself, as he might otherwise open himself to ethics issues, and was only conducted in chambers to give Manno a chance to correct misleading statements made in his motion for severance before those statements were contested in open court. *See Scarfo*, 41 F.4th at 185, 185 n.44.

Petitioner has not shown that his rights were in any way infringed or otherwise affected by the discussion between the trial judge, the Government, and Manno in relation to Manno's filings, and has thus not shown that he had any entitlement to have his counsel present during this conversation. That the conversation, which did not affect Petitioner's substantial rights and focused on the risks to Manno should he represent himself going forward, occurred without Petitioner or his counsel did not violate petitioner's Sixth Amendment or Due Process rights. *See,*

*e.g.*, *Missouri v. Frye*, 566 U.S. 134, 140 (2012) (stating that the Sixth Amendment right to have counsel present applies to "critical stages" of the criminal proceedings where necessary to protect the defendant's substantial rights, such as arraignments, post-indictment interrogations, post-indictment lineups, guilty pleas, etc.); *United States v. Wade*, 388 U.S. 218, 227-28 (1967) (noting that right to counsel does not require counsel's presence during proceedings where there is "minimal risk that his counsel's absence . . . might derogate from his right to a fair trial"). Because Petitioner's rights and risks were not the subject of this hearing, and the discussion focused on Manno and there was, at most, minimal risk that the absence of Petitioner and his counsel affected Petitioner's right to a fair trial, Petitioner cannot show that his rights were violated by his absence at this conference. Petitioner's claim, therefore, provides no basis for habeas relief.

**H. Petitioner's ineffective assistance of counsel claims**

In his motion to vacate sentence, Petitioner raises a number of claims in which he asserts that his trial counsel was constitutionally deficient. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of

> reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . [and] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In his first ineffective assistance claim, Petitioner contends that, had counsel properly investigated the tracking number issue discussed in relation to ground one above, he would have produced information which would have led to Petitioner's acquittal or the overturning of his conviction. As one court in this District has explained,

> [i]n *Strickland*, the Supreme Court held that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

> 466 U.S. at 691. "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (internal quotations omitted); *see also United States v Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a counsel cannot be said to have made an informed, strategic decision not to investigate); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).
>
> Where a Petitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice. In order to do so,
>
> > a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produce[d] a different result."
>
> *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of [p]etitioner's case); *accord United States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

*Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016).

In this matter, Petitioner has failed to show or even properly allege any specific information which would have been discovered had counsel looked further into the tracking number. Petitioner relies on mere speculation that something surely must have been discoverable, when everything in the record before the Court instead suggests that the FirstPlus investigation did begin in 2007 and

the tracking number on which Petitioner bases his speculation is, at best, a red herring. Because Petitioner has not alleged specific information that would have been discovered had counsel delved deeper on this issue, he has failed to make a prima facie showing of ineffective assistance of counsel and this claim provides no basis for relief. *See Brown*, 2016 WL 1732377, at *4-5.

In a related claim, Petitioner contends that appellate counsel proved ineffective in failing to raise the claim that the tracking number implies suppressed evidence or perjury or that Petitioner was never actually indicted on direct appeal. While appellate counsel's decisions are subject to the same ineffective assistance standard applicable to trial counsel claims, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), "it is a well established principle that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) (citing *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)), and appellate counsel need not raise every nonfrivolous claim a defendant wishes to pursue, *Jones*, 463 U.S. at 751. As the chief component of effective appellate advocacy is the winnowing out of weaker claims in favor of those with a greater chance of success, *id.* at 751-52; *Smith v. Murray*, 477 U.S. 527, 536 (1986), the Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome[,]" *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). As discussed above, Petitioner is incorrect in asserting that he was never indicted, and his claims related to the tracking number rely entirely on speculation and are unsupported by allegations of any clear wrongdoing. It is thus evident that these claims were not clearly stronger than those counsel raised on direct appeal – which resulted in an extremely detailed and lengthy published decision from the Third Circuit. Here, Petitioner cannot show that he was prejudiced by counsel not raising these seemingly spurious issues on direct appeal. These claims thus provide no basis for relief.

Petitioner also argues that appellate counsel proved ineffective in failing to make his arguments related to the *Botsvynyuk* case on direct appeal. Petitioner, however, did raise a claim on direct appeal asserting that he should have been permitted to file a motion for a new trial on that basis, and the Third Circuit rejected the claim as meritless. Likewise, as discussed above, Petitioner's claims regarding the *Botsvynyuk* case and its relevance to this matter are entirely speculative and belied by the record. Had counsel attempted to raise those claims on direct appeal, they almost certainly would have been rejected as meritless, and those claims clearly were not obviously stronger than those counsel did raise. Petitioner thus cannot show that appellate counsel proved ineffective for failing to raise these claims in the exact form Petitioner preferred. Petitioner's ineffective assistance of appellate counsel claim based on the failure to raise the *Botsvynyuk* issues is without merit.

Petitioner's next series of ineffective assistance claims assert that his trial and appellate counsel were ineffective in not fully raising his claims related to the unadmitted exhibits during trial and on direct appeal. As explained more fully above, Petitioner's claims related to the unadmitted exhibits did not warrant relief because Petitioner failed to show that he was prejudiced by the inadvertent failure to admit them formally. Further, Petitioner's claims related to these issues, even if raised on direct appeal, would not have met the plain error standard sufficient to warrant relief. Likewise, had the issue been raised prior to deliberations rather than post-trial or on direct review, the issue would have been resolved by the Government entering them into evidence and correcting the oversight because nothing Petitioner has submitted demonstrates that any of the exhibits were inadmissible. Moreover, Petitioner had ample opportunity to address that issue in his pretrial motions before Judge Kugler. As Petitioner's claims could not meet the plain error standard, Petitioner has not shown he was actually prejudiced by the jury having access to these exhibits. Petitioner, therefore, has failed to show that these claims were clearly stronger than

the claims counsel did raise on appeal or that he was prejudiced by counsel's failure to raise them. These ineffective assistance claims are therefore without merit.

Petitioner also argues that both his trial and appellate counsel were ineffective in failing to object to or raise a claim based on the intrinsic evidence discussed above in relation to his conspiracy obstruction charge. As discussed above, that evidence was clearly admissible and any motion to suppress it on the basis Petitioner provides would have failed. Counsel therefore was not ineffective in failing to raise it either at trial or on direct appeal. *See United States v. Aldea*, 450 F. App'x 151, 152 (3d Cir. 2011) (counsel cannot be ineffective in failing to raise a meritless objection); *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) (same).

Petitioner relatedly argues that counsel proved ineffective in objecting to Manno mentioning during his summation that he advised Petitioner to plead guilty to the supervised release violation. Given the readily admissible evidence in the record that Petitioner had, in fact, violated his supervised release and lied about it on several occasions, including the intrinsic evidence discussed above regarding the violation proceedings, Petitioner cannot show that he was prejudiced by this portion of Manno's summation. Petitioner's ineffective assistance of counsel claim on that basis therefore fails.

Petitioner also argues that counsel's failure to object to Petitioner being referred to as an offender in relation to his supervised release and violation thereof amounted to ineffective assistance of counsel. As discussed above, however, Petitioner's prior conviction, supervised release status, and violation of his supervised release status were all in evidence during the trial. Petitioner, therefore, cannot show that he was prejudiced by counsel's failure to object to the use of the term offender regarding Petitioner with respect to his supervised release. Here, Petitioner cannot show that there is any likelihood that the outcome of his case would have differed had

counsel moved and successfully had the term forbidden or stricken from the record. Petitioner's ineffective assistance claim on this basis is, thus, without merit.

Petitioner also asserts that his trial and appellate counsel proved ineffective in failing to more adequately brief and argue his claim regarding counsel's absence during the conference between the Government, Manno, and the trial judge on Manno's severance motion, and in failing to move for severance from Manno. Counsel, however, did raise the issue of the conference with the Third Circuit. The Third Circuit rejected any finding of error on that basis because nothing that occurred during that conference, which focused solely on Manno and had little, if anything, to do with Petitioner, violated Petitioner's rights. As the Court discussed above, Petitioner has failed to show that he had any right to counsel's presence at the conference. Petitioner, accordingly, has failed to show that he was prejudiced by counsel's alleged failure to "better" argue that the conference violated his rights. Petitioner likewise has failed to present any valid basis for a severance from Manno. Given the admissibility of the evidence regarding his violations of his supervised release discussed above, Petitioner has not shown that he was prejudiced by counsel's failure to move to sever his case from Manno based on the intrinsic evidence or the conference in chambers. These claims thus also fail to state a basis for habeas relief.

In the final claim of his motion to vacate sentence, Petitioner argues that his counsel proved ineffective insomuch as counsel had no direct background in securities law, and did not call any securities law experts at trial and instead focused his defense on attempting to dispute the idea that the FirstPlus scheme was an LCN operation. In so doing, Petitioner fails to identify any specific failing—any specific legal theory that was not presented, any specific motion that was not filed, or any specific expert witness who was available to testify that counsel declined to call—to support his belief that counsel was ineffective in addressing the securities aspects of his criminal case. In the absence of any allegation of a specific failing, Petitioner cannot show that counsel's

performance was deficient or that he was prejudiced by counsel's strategic choice to focus on dispelling the LCN aspect of the case rather than engaging in unspecified litigation related to securities law. Petitioner has thus failed to show that counsel was ineffective, and this claim must be denied as meritless. This Court has considered Petitioner's claims and finds that they are procedurally barred, without merit, or both barred and meritless. Petitioner's motion to vacate sentence, consequently, must be denied.

### I. Petitioner's supplemental motion to vacate sentence and motion seeking appointed counsel

In a supplemental motion to vacate, Petitioner contends that his securities fraud conviction cannot stand in light of the Supreme Court's decision in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024). Essentially, Petitioner argues that his securities conviction is based on a pure omission, which he believes renders his conviction infirm. Even were the Court to put aside the timeliness of Petitioner's supplemental claim, the dubious merits of his assertions given the fact that the omissions in this case rendered the other statements made by FirstPlus in the relevant documents materially misleading, *see, e.g.*, *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 347-55 (S.D.N.Y. 2024) (post-*Macquarie* it remains unlawful under Rule 10b-5 to make omissions that render other provided information materially misleading), and the fact that Petitioner's *Macquarie* claim appears to be procedurally defaulted because he could have, but did not, raise the issue at trial or on direct appeal,[5] the Court need not address this claim because it would, if meritorious, at most undermine only one of Petitioner's convictions for which he received a concurrent sentence.

---

[5] Although *Macquarie* post-dated Petitioner's conviction, relevant Third Circuit precedent and the fact that *Macquarie* did not present a new rule of law but rather a logical extension of the relevant rule and statutory plain text made the claim readily available even before the Supreme Court ruled. *See, e.g.*, *Macquarie*, 601 U.S. at 264-65 (describing ruling as a logical outcome of the plain text of the relevant rules and statutes); *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000).

"Under the concurrent sentence doctrine, a court has 'discretion to avoid resolution of legal issues affecting less than all counts in an indictment if at least one will survive and sentences on all counts are concurrent.'" *Parkin*, 565 F. App'x at 152 (quoting *United States v. McKie*, 112 F.3d 626, 628 n.4 (3d Cir. 1997)); *see also Duka v. United States*, 27 F.4th 189, 194-95 (3d Cir. 2022) (extending doctrine to cases involving even a consecutive sentence in a habeas proceeding where victory on the claim asserted would not change the fact or length of the petitioner's sentence in light of an unchallenged life sentence); *Gardner v. Warden Lewisburg USP*, 845 F.3d 99, 104 (3d Cir. 2017). This doctrine serves as an independent basis to decline to review a collateral attack so long as success on the claim would not alter the length of the petitioner's detention in light of the concurrently imposed sentences and the petitioner fails to show that there are other unique continuing consequences from the challenged count which would warrant a decision on the merits. *Duka*, 27 F.4th at 195-96.

Because a habeas petitioner, including a petitioner in a § 2255 proceeding, may not use his habeas challenge to attack fines, fees, or special assessments and may instead only challenge the fact or length of his detention, such fines and fees arising from the challenged count are not a basis to avoid the application of the concurrent sentencing doctrine in a habeas proceeding. *Id.* As Petitioner's *Macquarie* claim goes only to his securities conviction, and as Petitioner received a 240-month sentence on his RICO, wire fraud, and money laundering charges and a concurrent 360-month sentence on his conspiracy to commit bank fraud charge, which was made concurrent to his 60-month sentence on his securities fraud related conviction, the Court need not reach the merits of Petitioner's *Macquarie* claim because it falls within the ambit of the concurrent sentencing doctrine. (*See* Docket No. 11-740 at ECF No. 1306.) Petitioner's *Macquarie* claim thus provides no basis for habeas relief in light of the concurrent sentences he received.

Finally, Petitioner also filed a motion seeking appointed counsel. (ECF No. 9.) As all of Petitioner's claims are either barred or without merit for the reasons discussed above, the Court finds that the appointment of counsel is not warranted in this matter. *See, e.g.*, *Shelton v. Hollingsworth*, No. 15-1249, 2015 WL 2400780, at *3 (D.N.J. May 18, 2015) (stating that there is no right to counsel in a habeas proceeding, and counsel may be appointed only if the court finds that the interests of justice so require and that the petitioner is indigent). Petitioner's counsel motion (ECF No. 9) is therefore denied.

### J. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Because all of Petitioner's claims are meritless or barred for the reasons expressed above, Petitioner has failed to make a substantial showing of a denial of a constitutional right, and his motion is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's motion to vacate sentence (ECF No. 1) is **DENIED**, Petitioner's supplemental motion (ECF No. 15) is **DENIED**, Petitioner's motion

seeking appointed counsel (ECF No. 9) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: October 13th, 2026